IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

JAMES MOORE,
*Defendant.*

Criminal No.: ELH-04-190

**MEMORANDUM OPINION**

This Memorandum Opinion resolves a motion for compassionate release filed by defendant

James Moore, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  In April 2007, a jury in the District of

Maryland found Moore guilty of five charges: conspiracy to distribute a controlled substance, in

violation of 21 U.S.C. § 846 (Count One); conspiracy to possess firearms in furtherance of a drug

trafficking crime, in violation of 18 U.S.C. § 924(o) (Count Two); and three counts relating to the

discharge or possession of a firearm in furtherance of a drug trafficking crime, in violation of 18

U.S.C. § 924(c) (Counts Three, Four, and Seven).  ECF 135.  At sentencing in July 2007, pursuant

to §§ 2D1.1(d)(1) and 2K2.1(c)(1) of the United States Sentencing Guidelines ("Guidelines" or

"U.S.S.G."), Judge Andre M. Davis applied the murder cross-reference under U.S.S.G. § 2A1.1(a)

and sentenced Moore to a total term of life imprisonment plus 35 years.  ECF 142; ECF 301, ¶

26.[1]

Moore initially filed a pro se motion for compassionate release (ECF 277), supported by

exhibits.  ECF 277-1.  Counsel was subsequently appointed to represent Moore.  ECF 283.

Through counsel, Moore filed a supplemental motion for compassionate release (ECF 285), which

is supported by exhibits.  ECF 288.  Moore's attorney also filed two additional supplements, with

---

[1] Judge Davis was elevated to the Fourth Circuit. Thereafter, in July 2011, the case was
reassigned to me. *See* Docket.

exhibits.  ECF 299; ECF 300.  I shall refer to ECF 277, ECF 285, ECF 299, and ECF 300 collectively as the "Motion."

The government opposes the Motion (ECF 296, the "Opposition"), supported by exhibits. ECF 296-1.  And, Moore has replied.  ECF 298 (the "Reply").

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the Motion in part and reduce Moore's sentence to 40 years of imprisonment.

## I.  Factual Background[2]

Moore and codefendant Porsha Harper were charged with various drug and firearms offenses in an Indictment issued on April 7, 2004. ECF 1.  Superseding indictments were returned on August 11, 2004, September 1, 2004, and April 6, 2006.  *See* ECF 10; ECF 24; ECF 106.  The First Superseding Indictment added Walter Babb as a codefendant.   ECF 10.   The Third Superseding Indictment charged Moore and Babb with conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine and 50 grams or more of crack cocaine, in violation of 21 U.S.C. § 846 (Count One); conspiracy to possess firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(o) (Count Two); two counts of discharging a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts Three and Four, regarding the shootings of Willie Robinson and Alexandria Withers); two counts of use of a firearm to commit murder in furtherance of a drug trafficking crime, in violation of 18 U.S.C.

---

[2] Many of the filings in the case predate electronic access. Aside from two filings in 2007 (ECF 131; ECF 142), electronic filings do not begin until November 25, 2008, with ECF 176.

Over the years, I have gained considerable familiarity with the case. I incorporate here the factual background set forth in my Memorandum Opinion of June 4, 2021 (ECF 275), resolving the compassionate release motion filed by codefendant Walter Babb, and my Memorandum Opinion of April 10, 2012 (ECF 197), resolving post-conviction petitions brought by Moore and Babb under 28 U.S.C. § 2255.

§ 924(j) (Counts Five and Six); and possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Seven).

Judge Davis resolved a number of pretrial motions filed by Moore and Babb.  *See* ECF 87 to ECF 101 (motions); ECF 107; Docket, Sept. 15, 2006; Docket, Apr. 2, 2007.  In addition, on September 8, 2006, the government filed a sentencing enhancement notice for Babb under 21 U.S.C. § 851, stating that Babb had five prior felony drug offenses.  ECF 117.

Babb and Moore proceeded to a jury trial that began on April 2, 2007.  *See* Docket.[3]  The following summary of the facts is drawn primarily from the government's submission for Moore's Presentence Report ("PSR").  ECF 301.[4]  The submission was based on the evidence presented at trial.  *Id*. ¶¶ 6-18.

From at least 2002 through 2004, Moore was part of a drug trafficking organization that distributed large quantities of powder cocaine and cocaine base in Maryland.  *Id*. ¶¶ 17-18.  The evidence showed that during the course of the conspiracy, Babb purchased and distributed well over 1.5 kilograms of crack cocaine.  *Id*. ¶ 17.  For example, for a several month period from late 2002 to early 2003, Babb bought and distributed one-half kilogram of crack cocaine a week from his source of supply, Richard Jackson.  *Id*.  And, in the spring of 2002 until the fall of 2002, Babb bought nine ounces of crack cocaine per week from Jackson.  *Id*.

In July of 2003, Moore received at least 30 grams of crack cocaine from associate Willie Robinson.  *Id*. ¶ 18.  And, in 2004 he facilitated the delivery of some 200 grams of crack cocaine,

---

[3] On November 9, 2006, Harper pleaded guilty to the offense of obstruction of justice. *See* Docket, 11/9/2006.

[4] Judge Davis's Chambers file contains a copy of the PSR. Because I cannot determine if the PSR was docketed at the time of the sentencing, I recently submitted it for docketing. *See* ECF 301.

and later two ounces of mixed crack and powder cocaine, to an associate, while he was held in the Cecil County Detention Center.  ECF 301, ¶ 18.

During the conspiracy, Moore also traveled to El Paso, Texas to broker high-volume cocaine purchases.  *Id*.  In September 2003, Moore travelled to El Paso in an unsuccessful attempt to buy a kilogram of cocaine.  *Id*.  And, in "late September/October 2003," Moore, along with Babb, Robinson, and associate Alexandria Withers, again travelled to El Paso.  *Id*.  Moore was to "act as the middle-man for a multi-kilo cocaine transaction" between Robinson and an El Paso source of supply, Rey Sanchez.  *Id*.  Babb returned from the trip with a quantity of crack cocaine, although the exact amount is unknown.  *Id*.  According to several witnesses, half the deal was done in El Paso and the other half of the deal was to be completed on November 5, 2003, in Greensboro, North Carolina, where Babb lived, at a meeting to which Robinson brought at least $100,000.  *Id.* ¶¶ 10, 18; ECF 271 (Babb PSR), ¶¶ 10, 28.  Apparently, Moore and Robinson had a monetary dispute.  ECF 182-1 at 9.

On November 6, 2003, Maryland State Trooper James Cameron stopped a Dodge Intrepid for speeding, while the vehicle was traveling northbound on Interstate 95 in Cecil County.  ECF 301, ¶ 7.  At the time, Moore was driving and Harper was in the passenger seat.  *Id*.  The Intrepid was registered to Barbara Hayes, the mother of Robinson's son, who testified that she gave the car to Robinson in September of 2003.  *Id*. ¶ 11.  During the traffic stop, Moore stated that he did not have a driver's license; that his name was "James Evans;"[5] and that he was traveling from South Carolina to New York.  *Id*. ¶ 7.  Trooper Cameron patted Moore down after noticing a bulge in one of his pockets, and he discovered approximately $1,000 in Moore's pocket.  ECF 197 at 4.  The officer was suspicious because of the cash; discrepancies in statements by Moore and Harper

---

[5] Evans is the last name of Moore's mother. ECF 301, ¶ 7.

regarding Moore's name, their destination, and ownership of the Intrepid; and he noted that the rear end of the vehicle was unusually low.  ECF 197 at 4; ECF 301, ¶ 8.  The trooper called for backup, and two additional officers responded.  ECF 197 at 4.

Trooper Cameron continued to speak with Harper, who appeared shaken.  *Id*.  Trooper Cameron commented on the unusually low rear end of the vehicle.  Harper then asked the trooper if he wanted to look in the trunk.  *Id*.; ECF 301, ¶ 8.  The officer answered in the affirmative.  ECF 197 at 4.  Harper opened the trunk, revealing two corpses.  *Id*.; ECF 301, ¶ 8.  The bodies were later identified as those of Robinson and Withers.  ECF 301, ¶ 9.  Subsequent autopsies and firearm examinations revealed that Withers had been shot nine times with a 9mm pistol, probably a Glock, and that Robinson had been shot five times, most likely with the same gun.  *Id*.  Both had been shot in the head, and several of the injuries were at very close range.  *Id*.

Each body was wrapped in bedding, garbage bags, and a shower curtain liner.  *Id.* ¶ 13.  The bedding and shower liner were identified at trial as having come from Babb's residence in North Carolina.  *Id*.  Moore's fingerprints were recovered from the bags wrapped around the bodies, as well as a separate trash bag recovered from the trunk.  *Id*.

Moore and Harper were both arrested at the scene.  *Id*. ¶ 8.  In a post-arrest statement to a trooper, Moore stated that he was a drug dealer, and that he transported "coke and 'weed'" from El Paso to New York for an El Paso drug dealer.  *Id*.  He admitted that he had fired a handgun and several other firearms recently, while in South Carolina.  *Id*.  He stated that he had over $100,000 in a green backpack in the Intrepid, to be used to pay for cocaine in New York, and that he had been given both the money and the Intrepid by "people in North Carolina."  *Id*.  He gave varying accounts of how he had met Harper, and did not mention Babb.  *Id*.  He denied knowing that the bodies were in the trunk, stating that he had never looked in the trunk, never used the car before,

and that it was not his car.  ECF 301, ¶ 8.

The green backpack was recovered from the Intrepid.  *Id*. ¶ 16.  It had belonged to Devin Bush, a son of Davita Bush, with whom Moore had lived until September 2003 in Andrews, South Carolina.  *Id*.  It contained $100,380 in cash, most of it bundled in money wrappers.  *Id*. Robinson's fingerprints were found on two of these money wrappers.  *Id*.  And, Moore's fingerprints were found on one of the money wrappers.  *Id*.  The backpack also contained a leopard head pendant identified as belonging to Withers.  *Id*.  According to the government, the money found in the backpack was the money brought by Robinson to the meeting in Greensboro on November 5, 2003, to complete the drug deal.  *Id*. ¶ 18.

Other items were recovered from the Intrepid or Moore's person.  The sum of $1,500 was recovered from Moore's left pocket, and $767 was found in his right pocket; a five-dollar bill was found in his right pocket that had a blood stain from which Robinson's DNA was recovered.  *Id*. ¶ 12.  Another garbage bag was recovered from the trunk containing clothing of the victims, including a baseball hat that had blood matching Robinson's DNA.  *Id*. ¶ 14.  The bag also contained a floral bath mat and a black shower curtain, both identified as coming from Babb's Greensboro residence, as well as four spent 9 mm shell casings.  *Id*.  Moore's fingerprints were recovered from the garbage bag.  *Id*.  The passenger compartment of the Intrepid contained a black duffel bag with a tan "Charlie Brown shirt" belonging to Moore.  *Id*. ¶ 15.  A bloody stain on this shirt matched Robinson's DNA.  *Id*.  Two plastic containers of gasoline were found in the rear passenger compartment.  *Id*.  Express Mail receipts and Western Union money orders "in the name of Moore to Davita Bush" were recovered, sent from El Paso and Greensboro in October 2003. *Id*. ¶ 16.  Other items included a map to El Paso; a calendar with Babb's phone number written on it; and a pen inscribed with the name of an El Paso auto repair business.  ECF 197 at 5.

After the arrest of Moore and Harper, Babb paid Harper's bail ($21,000 in cash) and sent at least $35,000 to Davita Bush. ECF 301, ¶ 18. The government contends that this supports the conclusion that Moore had only half of the money taken from Robinson. *Id*. Babb also changed his cell phone number, moved out of his house, and disposed of some of his furniture. ECF 271, ¶ 32. Robinson's DNA was later recovered from the cushion of one of the discarded couches. *Id*.

Babb was arrested in Greensboro in August of 2004. *Id.* ¶ 47. After his arrest, officers executed a search warrant at Babb's home and discovered two assault rifles, a Glock pistol, a scale, some Ecstasy pills, and an identification card for Babb. *Id*.

Prior to the submission of the case to the jury, the government dismissed Counts Five and Six. ECF 197 at 7. On April 19, 2007, the jury convicted Moore of all remaining counts: Counts One, Two, Three, Four, and Seven. ECF 135. Babb was convicted of Counts One, Two, and Seven, but the jury was unable to reach a verdict as to Counts Three and Four. *Id*. As noted, Counts Three and Four are the § 924(c) counts relating to the murder of Robinson and Withers. *Id*.; ECF 301, ¶ 20. And, the jury found that the drug quantities for cocaine and crack cocaine set out in 21 U.S.C. § 841(b)(1)(A) applied to both Moore and Babb. ECF 301, ¶ 20. At the time, those amounts were 5 kilograms or more of cocaine and 50 grams or more of crack cocaine.

At Babb's sentencing, the government stated that it did not "know who pulled the trigger in this case." ECF 192-2 (Babb Sentencing Tr.) at 4. But, it speculated that "the jury or a couple of jurors . . . probably had an issue as to Mr. Babb's role in the actual murders." *Id*.

Sentencing for Moore was held on July 24, 2007. *See* Docket. Moore was 43 years old at the time. ECF 301 at 2a. According to the PSR, Count One and Count Two "grouped" under U.S.S.G. § 3D1.2(d). Under § 3D1.2(d), the offense level for the group corresponds to the higher of the offense levels for the offenses subject to grouping.

Moore had a base offense level of 32 for Count One, the drug conspiracy count, pursuant to U.S.S.G. § 2D1.1(c)(4), based on a finding that his criminal activity involved over five kilograms of cocaine and over 50 grams of crack cocaine.  ECF 301, ¶ 26.  And, he had a base offense level of 24 for Count Two (firearms conspiracy).  *Id.*  However, in determining the Guidelines range, the PSR applied the murder cross-reference provision, pursuant to U.S.S.G. §§ 2D1.1(d)(1), 2K2.1(c)(1), and 2A1.1(a), based on the murders of Withers and Robinson.  *Id.* ¶ 53. In particular, U.S.S.G. § 2D1.1(d)(1) states: "If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111, had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1."  Therefore, the PSR reflected an adjusted base offense level of 43.  ECF 301, ¶ 26.

The PSR also applied a two-level upward adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, based on Moore's materially false testimony during a motions hearing.  *Id.* ¶ 29. This resulted in a total offense level of 45 for Counts One and Two.  *Id.* ¶ 30.[6]

According to the PSR, Moore had ten prior adult convictions.  *Id.* ¶¶ 40-49.  In 1984, defendant pled guilty in the City Court of New Rochelle, New York to petty larceny, and was sentenced to conditional discharge.  *Id.* ¶ 40.  The same year, defendant pled guilty in the same court to attempted robbery, and was sentenced to six months of imprisonment.  *Id.* ¶ 41.

In 1986, defendant was found guilty in the Superior Court for Westchester County, New York of grand larceny, and was sentenced to 90 days of imprisonment, suspended, followed by a term of probation.  *Id.* ¶ 42.  In 1988, he appeared in court for a technical probation violation, at which time he was found guilty, discharged from probation, and sentenced to 90 days of

---

[6] Of course, there were no deductions for acceptance of responsibility.  Nonetheless, under the Guidelines, 43 is the highest offense level. *See* U.S.S.G. Ch. 5, Part A, Application Note 2.

imprisonment. ECF 301, ¶ 42. Also in 1986, defendant was found guilty in the New Rochelle City Court of criminal possession of a controlled substance, for which he was sentenced to 30 days of imprisonment. *Id*. ¶ 43.

Three years later, in June of 1989, defendant was found guilty in the District Court for Dallas County, Texas, of a violation of the Controlled Substances Act, and was sentenced to two years of imprisonment. *Id*. ¶ 44. He was paroled in November of 1989. *Id*. The same year, he was found guilty in the New Rochelle City Court of third degree assault, and ordered to pay a $100 fine. *Id*. ¶ 45.

In 1990, defendant was found guilty in the Superior Court for Westchester County of attempted criminal sale of a controlled substance, and sentenced to three to six years of imprisonment. *Id*. ¶ 46. In September of 1992, defendant was temporarily released, whereupon he absconded. *Id*. He was returned to incarceration in November 1992. *Id*. He was paroled in 1993, but parole was revoked in 1994, and Moore was returned to imprisonment. *Id*. He was paroled in 1995. *Id*.

In April 1994, defendant was found guilty in the New Rochelle City Court of criminal possession of a controlled substance, and sentenced to one year of imprisonment. *Id*. ¶ 47. He was granted conditional release in December of 1994. *Id*. He was found guilty in the New Rochelle City Court in 2000 of third degree assault, and granted a conditional discharge. *Id*. ¶ 48. Finally, in 2001, he was found guilty in Westchester County Court of criminal possession of a controlled substance. *Id*. A bench warrant was issued for defendant's arrest, and sentencing was still pending as of the PSR. *Id*.

These convictions yielded a criminal history score of 10 points. This equated to a criminal history category of V. *Id*. ¶ 50.

With a final offense level of 45 (43) for Counts One and Two, and a criminal history category of V, the Guidelines for Counts One and Two called for a sentence of life imprisonment. ECF 301, ¶ 61. Further, the PSR specified that Count One carried a statutory, mandatory minimum term of 10 years of imprisonment, pursuant to 21 U.S.C. § 841(b)(1)(A). *Id*. ¶ 56.[7]

The PSR also noted that the penalties for Counts Three, Four, and Seven were set by statute. *Id*. ¶¶ 35-37.   In particular, Count Three had a mandatory minimum term of ten years imprisonment, consecutive to any other count of conviction, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii). *Id*. ¶ 58. Count Four carried a mandatory minimum term of imprisonment of 25 years, consecutive to any other count of conviction, pursuant to § 924(c)(1)(C)(i). *Id*. ¶ 59. And, Count Seven had a mandatory minimum term of 25 years, consecutive to any other count of conviction, pursuant to § 924(c)(1)(C)(i). *Id*. ¶ 60.[8]

Notably, the PSR included the following text as to the "Government's version of the Sentencing Guidelines" with respect to the § 924(c) counts: "Pursuant to 18 U.S.C. § 924(c)(1)(A)(iii) Moore should receive a consecutive ten year sentence for the violations of 18 U.S.C. Section 924(c) in counts three and four (which occurred at the same time) and a consecutive 25 year sentence for his conviction for violation of Section 924(c) in Count 7. *See* 18 U.S.C. § 924(c)(1)(C)." *Id*. ¶ 19.

Moore is 5'9" and at sentencing he weighed approximately 285 pounds. *Id*. ¶ 76. He

---

[7] Pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 851, Babb faced a mandatory life sentence for Count One, due to his prior convictions.  ECF 271, ¶ 158; *see* ECF 117 (§ 851 notification).

[8] At the time, § 924(c)(1)(C)(i) provided for a mandatory minimum of 25 years of imprisonment for any "second or subsequent" § 924(c) offense, even if the convictions were not yet final and were within the same indictment. This procedure is known as "stacking." As discussed, *infra*, the First Step Act of 2018, § 403(a), Pub. L. 115-391, 132 Stat. 5239, 5221, amended this provision to apply only to prior final convictions.

declined to be interviewed for the PSR, and the information for the background section of the PSR was derived from a Pretrial Services Report that had been completed in 2004.  ECF 301, ¶ 72. Moore described his health as "'good,'" but reported that he had a "'sweat gland condition'" that has required several surgeries, as a result of which he is "considered fully disabled." *Id*. ¶¶ 76, 79. He stated that he consumes alcohol on a social basis, but denied any alcohol-related problems, or any use of illegal substances.  *Id*. ¶ 77.  Defendant reported that he attended school in New Rochelle, New York, but was "'kicked out'" his sophomore year.  *Id*. ¶ 78.

At sentencing, Judge Davis adopted the factual findings and advisory Guidelines application in the PSR without change, including as to the murder cross-reference and the two-level upward adjustment for obstruction of justice.  Statement of Reasons at 1.[9]  As noted, this resulted in a total offense level of 45, a criminal history category of V, and a Guidelines range of life imprisonment.  *Id*.  However, the maximum offense level under the Guidelines is 43.  *See* U.S.S.G. Ch. 5, Part A, Application Note 2.

Judge Davis sentenced Moore to life in prison as to Count One; 240 months of imprisonment as to Count Two, concurrent with Count One; 120 months of imprisonment as to Count Three, consecutive to Count One; 120 months of imprisonment as to Count Four, "concurrently" to the sentence in Count Three; and 300 months of imprisonment as to Count Seven, consecutive to Counts One and Three, for a total term of "Life plus 35 years."  ECF 142 (Judgment) at 2.[10]  Judge Davis also imposed five years of supervised release.  *Id*. at 3.  Bureau of

---

[9] I am unable to locate the Statement of Reasons on the docket. But, a copy is contained in Judge Davis's Chambers file.

[10] I note a seeming divergence between the mandatory minimum sentences for Moore, as outlined in the PSR (*see* ECF 301, ¶¶ 56-60), and Judge Davis's sentence. As indicated, the PSR provides that Count Three had a mandatory minimum term of 10 years of imprisonment, consecutive to all other counts; Court Four had a mandatory minimum term of 25 years,

Prisons ("BOP") records reflect that Moore received credit for his time in custody between November 6, 2003, and July 23, 2007.  *See* ECF 296-1 at 4.[11]

Moore's conviction and sentence were affirmed on direct appeal.  ECF 178; *see United States v. Babb*, 369 Fed. App'x 503 (4th Cir. 2010).[12]  And, his petition for certiorari to the Supreme Court was denied on October 4, 2010. *United States v. Babb*, 562 U.S. 878 (2010).

Moore subsequently filed a motion for post-conviction relief under 28 U.S.C. § 2255, pro

---

consecutive; and Count Seven also required a minimum of 25 years, consecutive. *Id*. This would result in a 60-year mandatory minimum sentence for the three § 924(c) offenses. *Cf. United States v. Robinson*, 404 F.3d 850, 862 (4th Cir. 2005) (noting that "the statute mandates that each sentence for convictions under § 924(c) must be imposed consecutively," and that, at the time, each "additional conviction[] under § 924(c) require[s] statutory minimum sentences of 25 years to run consecutively to each other").

But, Judge Davis sentenced Moore to 10 years of imprisonment for Count Three, and 10 years for Count Four, "concurrent" to the 10-year sentence for Count Three, followed by a 25-year consecutive sentence for Count Seven. ECF 142 at 2. This resulted in a total sentence of 35 years, consecutive, for the three § 924(c) convictions. *Id.*

The record does not appear to contain a contemporaneous explanation for the discrepancy. And, this issue is not addressed in the Motion briefing. But, as noted, the PSR reflects that the government believed concurrent 10-year terms were appropriate for Counts Three and Four because the two murders occurred at the same time. ECF 301, ¶ 19. And, when Moore challenged his consecutive § 924(c) sentences on "double jeopardy" grounds in his § 2255 Petition, the government stated in its briefing, ECF 192 at 62-63: "Though each victim's murder was a separate use of a firearm and the sentences for those counts probably should have been consecutive, Judge Davis exercised his discretion in favor of Moore and imposed concurrent 120 month sentences for those counts, perhaps because the evidence suggested they were committed at the same time." Thus far, this issue has been largely academic, given Moore's life sentence for Count One.

[11] Babb was sentenced to life imprisonment as to Count One; 20 years of imprisonment as to Count Two, concurrent with Count One; and 60 months of imprisonment as to Count Seven, consecutive, for a total term of life imprisonment plus 60 months.  ECF 143.  By Memorandum Opinion (ECF 275) and Order (ECF 276) of June 4, 2021, I granted in part Babb's motion under the compassionate release statute, as well as Section 404 of the First Step Act, and reduced his sentence to 30 years of imprisonment.

[12] The panel consisted of Judges Traxler, King, and Gregory.  The opinion was written by Judge Gregory.

se, raising numerous contentions.  *See* ECF 182.  I denied his motion by Memorandum Opinion and Order of April 10, 2012. ECF 197; ECF 198.  The Fourth Circuit denied a Certificate of Appealability and dismissed his appeal.  ECF 211; *see United States v. Moore*, 514 Fed. App'x 340 (4th Cir. 2013).

Moore is currently incarcerated at USP Tucson.  *See* ECF 288 at 29; *Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited July 7, 2022).  Including his credit for the period in pretrial detention from 2003 to 2007, Moore has served approximately 19 years of his sentence.  He is now 58 years old.  *See* ECF 301 at 2a.  Because of his life sentence, he has no projected release date.

BOP records indicate that Moore has had 10 disciplinary infractions while in custody.  *See* ECF 296-2 at 1-3.  The most recent, for refusing a work assignment, occurred on June 22, 2021, the same month in which Moore first filed the Motion.  *Id*. at 1.  The remainder occurred between 2008 and 2020.  *Id*. at 1-3.  Offenses have included asking another inmate to pass messages for Moore; fighting; phone abuse; giving or accepting money without authorization; possession of an unauthorized item; and being absent from assignment.  *Id*.

In his Motion, Moore asserts several health conditions, including high cholesterol; high blood pressure; diabetes; and "hidradenitis suppurativa," the sweat gland condition mentioned in the PSR, which causes the painful thinning of and tears in his skin in sensitive areas of his body, and which has necessitated six surgeries.  ECF 277 at 3-4; ECF 277-1 at 4-6; ECF 285 at 11.  Moore's vaccination status is not addressed in the briefing.  However, one of the administrative denials of Moore's compassionate release requests, dated May 6, 2021, states that defendant received both doses of the COVID-19 vaccine, one in March 2021 and the other in April 2021.  *See* ECF 288 at 5.  Moore indicates that, if released, he would live with his younger brother, Peter

Moore, in Waynesboro, Virginia, who will assist him in finding employment.  ECF 285 at 12; ECF 288 at 27 (Decl. of Peter Moore).

Moore has submitted multiple administrative requests for compassionate release to the Warden of USP Tucson, which have all been denied.  *See* ECF 277-1 at 2-3; ECF 288 at 2-5.  The government does not contest that Moore has properly exhausted his administrative requirements. *See* ECF 296 at 14.

## II.  Statutory Framework

## A. Compassionate Release

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C.   § 3582(c)(1)(B);   *see*   *Jackson*,   952   F.3d   at   495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had

14

to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under  § 3582(c)(1)(A),  the  court  may  modify  the  defendant's  sentence  if,  "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are

15

applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C.

§ 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[13] In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States*

---

[13] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).  In other words, the policy statement does not apply to this Court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.  *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c).  *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence

reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ."  *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  But, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, No. 22-6071, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors);

*United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted). And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### B. "Stacking" Under 18 U.S.C. § 924(c)

At the time of Moore's sentencing, a defendant could be sentenced for multiple § 924(c) charges at the same time, even if the convictions were not yet final. This would result in a consecutive sentence for the first § 924(c) offense and a mandatory minimum penalty of 25 years, consecutive, for each subsequent § 924(c) offense. *See United States v. Jordan*, 952 F.3d 160, 165

(4th Cir. 2020).  As noted, however, Judge Davis treated two of the § 924(c) convictions as one event, *i.e.*, Counts Three and Four.  *See* ECF 142.

Section 403(a) of the 2018 FSA amended the language of 18 U.S.C. § 924(c)(1)(C) by striking a "second or subsequent conviction under this subsection" and inserting "violation of this subsection that occurs after a prior conviction under this subsection has become final."  Therefore, the amendment has effectively eliminated the procedure of "stacking" multiple § 924(c) convictions for the purpose of enhancing the penalties associated with "second or subsequent" § 924(c) convictions within the same indictment.  *Id*.  As amended, the enhanced mandatory minimum applies only if the prior qualifying § 924(c) conviction was made final before the new offense occurred.

In other words, the 2018 FSA amended § 924(c) so that it "no longer applies to multiple § 924(c) convictions obtained in a single prosecution."  *Jordan*, 952 F.3d at 171.  But, this provision is not retroactive.  *See* 2018 FSA, Section 403(a), (b); *see also Jordan*, 952 F.3d at 172.

### III. COVID-19

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[14]  COVID-19 spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

---

[14] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of July 18, 2022, COVID-19 has infected approximately 88.8 million Americans.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed July 18, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.  But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In May 2022, it updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[15] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since been approved for all persons five years of age and older. *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 67% of the total U.S. population is fully vaccinated, including 30% of people from

---

[15] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

ages 5 to 11, 60% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 92% of people age 65 and up. *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited July 18, 2022).

Moreover, approximately 107 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older. *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated June 13, 2022). And, federal regulators approved a second booster dose for individuals age 50 and older. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*,

WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States. It sparked further cause for concern, because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Nevertheless, that respite did not last long. We soon experienced another surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. A new subvariant of the virus began "spreading

rapidly" and soon became "the dominant form of the virus . . . ."   *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," is "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."   Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.   And, the "Biden administration is preparing for the possibility that 100 million Americans will be infected with the coronavirus this fall and winter . . . ."   Amelia Nirenberg, *A Coming Fall Surge?*,  N.Y. TIMES (May 9, 2022), https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.   *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).   However, social distancing is particularly difficult in the penal setting.   *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").   Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.   *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating

to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[16]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

---

[16] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of July 18, 2022, the BOP had 140,381 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 324,203 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed July 18, 2022).

As of July 18, 2022, the BOP reported that 495 federal inmates, out of a total population of 140,381, and 389 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19. Moreover, 49,752 inmates and 13,201 staff have recovered from the COVID-19 virus. In addition, 301 inmates and seven staff members have died from the virus. The BOP has completed 128,702 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to USP Tucson, where the defendant is imprisoned, the BOP reported that as of July 18, 2022, out of a total of 1,413 inmates, one inmate and six staff members have tested positive, 13 inmates and zero staff members have died of COVID-19, and 841 inmates and 232 staff have recovered at the facility. In addition, 501 staff members and 1,793 inmates have been inoculated with the vaccine at the Tucson complex. *See* https://www.bop.gov/coronavirus/; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/tcp/ (last visited July 18, 2022).

### III. Discussion

### A. Extraordinary and Compelling Circumstances

In the Motion, defendant advances a variety of grounds as to why his case presents extraordinary and compelling circumstances. In particular, he cites his health conditions; his rehabilitative record and acceptance of responsibility; a general decline in federal life sentences

such as that imposed on Moore; the Court's previous reduction of the sentence for codefendant Walter Babb; Moore's declining risk of recidivism as he ages; and his release plan. *See* ECF 277; ECF 285. Defendant seeks immediate release or, in the alternative, a reduction in his sentence to "no more" than the 30-year sentence the Court imposed on Babb in resolving his compassionate release motion. ECF 285 at 13. The government vigorously opposes the Motion. ECF 296.

Moore, who was born in April 1964, is now 58 years old. *See* ECF 301 at 2a. As noted, he asserts several health conditions in the Motion, including high cholesterol; high blood pressure; diabetes; and "hidradenitis suppurativa," a sweat gland condition, which causes the painful thinning of and tears in his skin in sensitive areas of his body, such as his underarms and groin. ECF 277 at 3-4; ECF 277-1 at 4-6; ECF 285 at 11. Medical records submitted by defendant reflect that as of April 2010, he had "fairly recently been diagnosed as diabetic," but was on medication and was "doing well." ECF 277-1 at 5. Medical records also indicate that between 1999 and 2008, Moore's hidradenitis suppurativa had necessitated six surgeries, including the removal of defendant's sweat glands. *Id*. at 4-5. And, the records refer to Moore as hypertensive. *Id*. at 5. The government does not dispute or discuss Moore's medical conditions. But, Moore's health conditions do not appear to be the main focus of his supplemental motion (ECF 285).

I am mindful that the CDC's criteria are not binding in the analysis of whether a health condition qualifies as an extraordinary or compelling basis for compassionate release. *See Hargrove*, 30 F.4th at 194. Nevertheless, the CDC criteria provide useful information. The CDC notes that "a person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases," and that "[o]lder adults are at highest risk of getting very sick from COVID-19," highlighting that more than 81% of COVID deaths occur in people over age 65. *People with Certain Medical Conditions*, *supra*.

The CDC states: "Having either type 1 or type 2 diabetes can make you more likely to get very sick from COVID-19." *People with Certain Medical Conditions, supra*. As for hypertension, the CDC likewise states that "high blood pressure (hypertension)" potentially "can make you more likely to get very sick from COVID-19." *Id*.

Numerous courts have found extraordinary and compelling circumstances for defendants with chronic medical conditions such as diabetes and hypertension. *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. Oaks*, RDB-17-288, 2020 WL 3433326, at *3 (D. Md. June 23, 2020) (defendant with Type II diabetes, hypertension, asthma, anemia, hyperlipidemia, and arthritis); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 401 (E.D. Pa. 2020) (finding defendant's hypertension and diabetes qualified as extraordinary and compelling reason).

As to defendant's hidradenitis suppurativa, it is a serious condition.  But, defendant has presented no authority for the proposition that it increases his vulnerability to COVID-19.  *See United States v. McGrath*, No. 2:17-cr-125, 2021 WL 363548, at *4 (S.D. Ohio Feb. 3, 2021) ("Defendant has not show[n] that [her hidradenitis suppurativa]—while serious and undoubtedly difficult to deal with—places her at an increased risk of complications from COVID-19.").

Nonetheless, I am satisfied that, on the basis of defendant's health conditions, he has established the existence of extraordinary and compelling circumstances.  These circumstances are compounded, in my view, by intervening changes in sentencing law, which I discuss, *infra*.  *See McCoy*, 981 F.3d at 284-86 (affirming several district court rulings that reducing stacked § 924(c) sentences under the compassionate release provision as properly based on "individualized assessments" that took into account, *inter alia*, the "sheer and unusual length of the sentences" and the "'gross disparity' between those sentences and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct.") (internal citations omitted).

### B. Sentencing Factors

Even when a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186.  These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *Id*.

There is no doubt that Moore's crime was extraordinarily grave.  He was involved in a large-scale drug trafficking conspiracy that distributed significant quantities of cocaine and crack cocaine.  And, beyond that very serious crime, he was involved in the brutal shooting and murder of two people, apparently for monetary gain.  The jury convicted Moore of the two § 924(c) counts that related to the murders of Robinson and Withers.  *See* ECF 135.  Although the government stated at Babb's sentencing that it was unsure who "pulled the trigger" (ECF 192-2 at 4), that does not exonerate Moore.

In addition, Moore has an extensive criminal history, with ten adult convictions in multiple states stretching to 1984.  ECF 301, ¶¶ 40-49.  These range from controlled substances offenses to attempted robbery and third degree assault.  *Id*.  Given the horrific nature of Moore's crimes here, along with his disturbing criminal history, a lengthy sentence was amply warranted in this case.

As part of the § 3553(a) analysis, many judges in this District have considered a change in the sentencing law landscape that a defendant would face if prosecuted today for the same offense. As Judge Bennett has explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public."  *United States v. Johnson*, RDB-07-0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020).  *See*, *e.g.*, *Jones*, 2022 WL 2303960, at *1 (recognizing that courts have discretion "to *consider* leniency" in light of charges in current law) (emphasis in *Jones*); *McCoy*, 981 F.3d at 285-86; *United States v. Stockton*, ELH-99-352, 2021 WL 1060347, at *14 (D. Md. Mar. 17, 2021); *United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252,

ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).

The Motion does not rely on specific changes to sentencing law.  Rather, it focuses on a general trend away from life sentences.  *See* ECF 285 at 7-9.  But, the government notes a relevant change in the law, namely the First Step Act's reform to the § 924(c) "stacking" provision.  *See* ECF 296 at 6, 16-17.  As discussed, *supra*, the PSR forecast a 60-year total mandatory minimum sentence for Moore's § 924(c) charges: 10 years for Count Three, followed by 25 years each, consecutive, for Counts Four and Seven, under the "stacking" formula then in effect.  ECF 301, ¶¶ 56-60.  But, Judge Davis seemingly agreed with the government and imposed a total of 35 years, consecutive.  With the First Step Act's change in the law, the government asserts that the § 924(c) mandatory minimum sentences for Moore would now total 25 years: 10 years for Counts Three and Four, and five years for Count Seven.  ECF 296 at 16-17.  With Judge Davis's sentences of 10 years for Counts Three and Four, concurrent to each other but otherwise consecutive, along with five years, consecutive, for Count Seven, this would amount to a sentence of 15 years, consecutive to any other sentence.  And, the 10-year mandatory minimum for Count One, pursuant to 21 U.S.C. § 841(b)(1)(A), remains unchanged.

Nevertheless, the change in the law as to § 924(c) is not especially significant in this particular case.  First, I agree with the government (ECF 296 at 16) that the primary driver of Moore's sentence was the Guidelines range of life imprisonment for Count One, which was the result of the murder cross-reference.  And, there is no dispute that this Guidelines range would be the same today.  Second, as discussed, Judge Davis sentenced Moore to 35 years of imprisonment for the § 924(c) convictions, so the disparity is not as great as what it otherwise might have been.

Nevertheless, the sentence ultimately imposed by Judge Davis in 2007—life imprisonment plus 35 years—appears significantly longer than other federal sentences imposed more recently in this District and elsewhere for drug offenses involving murder.  As Judge Blake has observed, the average federal sentence for murder has declined in recent years.  *See United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)); United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2018, Fourth Circuit, available at (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/4c18.pdf), *aff'd*, *McCoy*, 981 F.3d 271.  And, the trend has continued since *Bryant* was decided: data from the United States Sentencing Commission reflects that in fiscal year 2020, the national average sentence for murder was 255 months, and the Fourth Circuit average was 271 months. See United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2020, Fourth Circuit, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/4c20.pdf.

For example, in *United States v. Floyd*, CCB-16-597, Floyd was one of several defendants convicted after a 25-day trial.  *See id.*, ECF 477; ECF 491.  In particular, Floyd was convicted of racketeering conspiracy that included murders and drug conspiracy.  However, he was not the shooter.  Although his offense level and criminal history category called for a life sentence, Judge Blake imposed a total sentence of 360 months' imprisonment.  *Id.*, ECF 691.

More recently, in *United States v. Antoine*, PWG-19-140, the defendant was involved in a drug trafficking organization in Baltimore and confessed to the intentional shooting and killing of an individual in relation to the drug conspiracy.  *See id*., ECF 349 at 9-10.  Pursuant to a plea agreement, Antoine entered a plea of guilty to one count of conspiracy to distribute controlled substances and one count of discharging a firearm resulting in death during and in relation to a drug trafficking crime.  *Id*.  Although Antoine was the shooter, Judge Grimm imposed a total sentence of 270 months (22.5 years).  *Id*., ECF 465.  The Court is mindful that Antoine pleaded guilty and thus accepted responsibility, unlike Moore.  And, there was one murder victim, not two.  Still, this is a significant disparity.

In *United States v. Whisonant, et al*., ELH-17-191, three of the defendants pleaded guilty to conspiracy to distribute heroin and to discharging a firearm resulting in death, during and in relation to a drug trafficking crime, or to possession of a firearm in furtherance of a drug trafficking crime.  One defendant received a total sentence of 360 months imprisonment, another received a sentence of 420 months, and still another received a sentence of 480 months of incarceration.  *See id*.  To be sure, in contrast to this case, the defendants in *Whisonant* admitted to the offenses; they spared the government, the court, and witnesses the burden of a trial; and there was only one murder victim.  Even so, the sentence here far exceeds what was imposed in that case.

The case of *United States v. Blake*, ELH-06-394, is also instructive.[17]  The defendant was convicted of carjacking resulting in death; conspiracy to possess a firearm in furtherance of a crime of violence; possession of a firearm in furtherance of a crime of violence; and murder resulting from possession of a firearm in furtherance of a crime of violence.  *Se*e ELH-06-395, ECF 62

---

[17] The case was initially assigned to Judge William Nickerson. It was reassigned to me on January 29, 2016, due to the retirement of Judge Nickerson. *See* Docket.

(Judgment).  In particular, a victim was murdered in the course of a carjacking in which Blake was a conspirator and a participant.  *See id*., ECF 123 at 3; *id*., ECF 149 at 2.  Significantly, Blake was only 17 years old at the time of the offense.  *See id.*, ECF 149 at 2.  He was originally sentenced to life imprisonment, but his sentence was ultimately reduced to 30 years of imprisonment following a joint motion by the Government and the defendant to reduce Blake's sentence and resolve his § 2255 motion (*id*., ECF 123) as well as a motion for compassionate release.  *Id*., ECF 165.

It is also noteworthy that defendant has served part of his sentence during the global pandemic.  This has arguably "increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction*." United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5, 456 F. Supp. 3d 557 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

In considering a motion under the First Step Act, courts often look to a defendant's post-sentencing conduct, because it "provides the most up-to-date picture of [his] 'history and characteristics.'"  *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)).  Rehabilitation efforts can be considered, although rehabilitation alone cannot serve as a basis for compassionate release.  *Davis*, 2022 WL 127900, at *1; *see Cohen*, 2022 WL 2314300, at *1 (indicating that district judge erred by failing to consider "positive postsentencing conduct"); *Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402, 410-12 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First

Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

While incarcerated, Moore has completed a number of educational and vocational courses. *See* ECF 288-1 at 14-25, 29.  And, he has worked as a caregiver for mentally ill prisoners, assisting them with their daily activities and providing them with companionship.  *See id*. at 10, 14-22. Defense counsel has submitted three letters from correctional officers at USP Tucson, praising Moore's work ethic, rehabilitation, and work as a caregiver.  *See* ECF 299-1; ECF 300-1.  For example, Senior Officer R. Sheriff, in a letter dated September 6, 2021, writes: "It is my sincere hope that Mr. Moore will be seriously considered for compassionate release/sentence reduction. In my time at this penitentiary, I have seen very few inmates who deserve it more."  ECF 299-1 at 1-2.  And, Senior Officer R. Bingham, in a letter dated September 10, 2021, writes: "For the past 5 years I have seen Moore transform from inmate to someone I see that could contribute to society . . . . If there is any inmate deserving of a compassionate release/sentence reduction, it would be inmate Moore without question."  *Id*. at 3.

Moore, too, has written the Court by letter dated July 25, 2021.  *See* ECF 288 at 7-12.  He states, *id*. at 7: "I wish to accept responsibility for the charges and the related conduct mentioned in the PSR."  Moore expresses regret for the "poor choices" he made that resulted in his situation, as well as the pain he has caused; describes how his life was affected by the death of his mother when he was 17 years old and by his hidradenitis suppurativa; discusses his rehabilitative work in

prison; and states that if released he will be a "law abiding citizen and a productive member of society." ECF 288 at 11; *see also id*. at 7-11.  However, he also states, *id*. at 7: "I did not commit the murders, but I was aware of them and agreed to remove the victims' bodies from North Carolina."  So, his acceptance of responsibility is perhaps less than fulsome.

In addition, as noted, defendant is now 58 years of age.  *See* ECF 301 at 2a.  Thus, if his sentence is reduced, in just a few years he will be of an age by which he poses a reduced risk of recidivism.  *See, e.g., United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *4 (D. Md. Aug. 17, 2020) (finding a recidivist offender would pose "little danger to the public at this point" because of his age of 63 years) (citing U.S. Sent. Comm., The Effects of Aging on Recidivism Among Federal Offenders, 2017, at 3 ("Older offenders were substantially less likely than younger offenders to recidivate following release . . . 13.4 percent of offenders age 65 or older at the time of release were rearrested[.]")).

Of import here, Moore's disciplinary record is mixed, at best.  He has accumulated 10 infractions, including one that is relatively recent.  *See* ECF 296-2.  In November 2019, Moore received an infraction for fighting.  *Id*. at 1.  On the other hand, with the exception of that infraction, Moore's infractions are all nonviolent, including phone abuse, possessing an unauthorized item, or refusing a work assignment.  *See* ECF 296-2.

The Motion emphasizes that the Court has already reduced the sentence of Babb from life imprisonment plus five years to 30 years of incarceration.  ECF 285 at 11-12; *see* ECF 275.  And, there are obviously similarities between the codefendants: both were charged with the same crimes; the murder cross-reference was applied against both defendants; and both men received extremely long sentences.  Moreover, as the Motion notes (ECF 285 at 12), Babb had a greater

criminal history than Moore, with his PSR listing 22 prior criminal convictions. *See* ECF 271, ¶¶ 72-137.

However, there are also some significant distinctions between the cases of Moore and Babb that undermine Moore's argument. These are discussed below.

Babb was subject to an § 851 sentencing enhancement on the basis of five prior criminal convictions. *See* ECF 117. Pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 851, this resulted in a mandatory sentence of life imprisonment as to Count One, not simply a Guidelines range of life imprisonment. But, under current law, only one of Babb's five prior convictions meets the requirements to trigger the § 851 enhancement. Thus, if Babb were sentenced today, an § 851 enhancement would have required a mandatory minimum term of 15 years' imprisonment for Count One, rather than life imprisonment. Although the Guidelines range would remain unchanged, this was a key factor in my finding of extraordinary and compelling circumstances as to Babb because, if sentenced today, the Court would not be compelled to sentence Babb to life imprisonment. *See* ECF 275 at 20-25, 32. Conversely, in Moore's case, there is no issue of an § 851 enhancement. In addition, in ECF 275, I also found Babb to be eligible for resentencing under Section 404 of the First Step Act, because he was convicted of a cocaine base offense. ECF 275 at 25-31. Although Moore would appear to be similarly situated, he has not filed a Section 404 motion, and the parties have not raised the issue.[18]

Moreover, whereas the jury could not reach a verdict as to Counts Three and Four for Babb, Moore was convicted of these counts. *See* ECF 135. And, these are the § 924(c) counts relating to the discharge of a firearm that led to the murders of Robinson and Withers. And, Babb had no

---

[18] Although no Section 404 motion was filed, the Court is certainly aware of the change in the law pertaining to crack cocaine.

disciplinary infractions over his 17 years of incarceration.  ECF 248 at 33.  In contrast, Moore has accumulated 10 infractions, including one for fighting in 2019.  I referred to Babb as a "model prisoner," which cannot be said of Moore.  ECF 275 at 36.  In other words, Moore and Babb are not similarly situated with respect to the § 3553(a) analysis.

The compassionate release ruling in Babb's case does not compel an identical result here. Indeed, more broadly, the Fourth Circuit has made clear that "a sentence is not 'unreasonable merely because it creates a disparity with a co-defendant's sentence.'"  *United States v. Gillespie*, 27 F.4th 934, 945 (4th Cir. 2022) (quoting *United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007), *vacated on other grounds*, 552 U.S. 1089 (2008)).  *See also, e.g.*, *United States v. Ball*, No. 19-4851, 2022 WL 861823, at *2 (4th Cir. Mar. 23, 2022) (sentence disparity between codefendants not unreasonable when adequately justified).

Given the gravity of Moore's offense, including the murder cross-reference, his criminal history, and his disciplinary infractions while incarcerated, immediate release is wholly unwarranted.   However, considering the length of defendant's sentence, as well as his rehabilitative efforts and his medical conditions, as well as the impact of the First Step Act's "stacking" reforms, and the change in the law as to drug quantities for cocaine base, I am of the view that a reduction in Moore's sentence is appropriate.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'"  *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact.  The statutory text of

the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

Accordingly, I find that a reduction in Moore's sentence is warranted.  Specifically, I will reduce his sentence from life imprisonment, plus 35 years, to a total sentence of 40 years of imprisonment.  Such a sentence is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.  18 U.S.C. § 3553(a).  In my view, the 10-year difference between the reduced sentences of Moore and Babb is appropriate in light of the differing circumstances of the two defendants, as discussed above.  The reduction of the sentence to 40 years of imprisonment also reflects the First Step Act's stacking reforms, which would result in a mandatory minimum today, as to the § 924(c) convictions, of ten years for Counts Three and Four, if sentenced concurrently as Judge Davis ordered, plus five years for Count Seven.  This is in contrast to the total of 35 years, consecutive, imposed by Judge Davis for the three § 924(c) offenses.

In particular, I will reduce Moore's sentence for Count One to 25 years (300 months) of imprisonment.  And, I will reduce Moore's sentence for Count Seven to five years (60 months) of imprisonment, consecutive.  I will leave unchanged Moore's 20-year (240-month) sentence for Count Two, concurrent with Count One, as well as his concurrent 10-year (120-month) sentences for Counts Three and Four.  This results in a total sentence of 40 years (480 months).  And, Moore shall receive the credit reflected in his BOP records.[19]

### IV. Conclusion

For the reasons stated above, I shall grant the Motion in part, and reduce Moore's sentence to 40 years of imprisonment.

An Order follows, consistent with this Memorandum Opinion.

Date: July 19, 2022                                                    /s/
                                                    Ellen L. Hollander
                                                    United States District Judge

---

[19] To be clear, the Court believes that a 40-year total sentence is appropriate. I have attempted to impose this consistent with the mandatory minimums for the § 924(c) counts.